(48 South. 935.)

No. 17,186.

FARWELL et al. v. ELLINGTON PLANTING CO., Limited.

(Feb. 15, 1909.)

1. LEASE OF PLANTATION—GOOD CONDITION.

The lease of the plantation is general in its terms.

2. RETURN IN GOOD CONDITION.

About the return of the property at the end of the lease, it contains the stipulation that the lessee return the property in the good condition received.

3. ISSUE—CONTRACT.

The suit turns upon the stipulation: Good condition.

4. PLAINTIFFS' CONTENTION.

The plaintiffs' contention is that the property leased was not returned in good condition at the end of the lease.

5. DENIAL BY DEFENDANT.

The defendant denied plaintiffs' allegation.

6. LANDLORD AND TENANT (§ 160*)—CONDITION OF PREMISES AT TERMINATION OF TENANCY—PRESUMPTION.

No inventory having been taken as directed by article 2720 of the Civil Code, the plaintiffs urge that the presumption stated in the article was controlling.

The testimony rebuts the presumption.

It does not appear that the plantation was in very good condition just prior to the lease, nor at the end of the lease.

Whatever difference there was in the condition of the place is not made to appear in a sufficiently clear manner to sustain a judgment for the damages for which plaintiffs pray.

[Ed. Note.—For other cases, see Landlord and Tenant, Dec. Dig. § 160.*]

(Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; John St. Paul, Judge.

Action by Charles A. Farwell and others against the Ellington Planting Company, Limited. Judgment for defendant, and plaintiffs appeal. Affirmed.

Solomon Wolff, for appellants. Carroll, Henderson & Carroll, for appellee.

BREAUX, C. J. This is a suit for damages to a plantation. Over $27,000 is the amount of plaintiffs' claim.

Plaintiffs, owners of the Ashton sugar plantation, leased it to defendant for one year, from January, 1902, to January, 1903.

At the end of the first year the lease was renewed for a period of two years, bringing the term of the lease to December 31, 1905, on which date it came to an end.

The pertinent provision of the lease was that at the end of this lease the plantation was to be delivered back to the lessors, also the ditches, canals, bridges, drainage machinery, railroad track, locomotive, and cars, carts, farming utensils, and implements, ordinary wear and tear and vis major excepted, in the same good condition as lessee would find it on taking possession. (The lease was entered into a few months before lessee went into possession of the place.)

It was further stated in the contract of lease that the lessee was to preserve the

drainage of the plantation by cleaning the ditches. Further, lessee bound itself to keep the machinery and buildings in good order and condition, all at lessee's expense.

In another paragraph of the lease, lessee bound itself to leave at the expiration of the lease good and sound seed cane equal in quantity and quality to that found by the company on taking possession.

The company also bound itself to leave the same quantity of sound first-year stubble as would be left on the plantation at the date that lessee would take possession.

As the term of the delivery of the plantation was near at hand, on January 9, 1906, plaintiffs wrote to the representative of the defendant company proposing that each would appoint a representative to examine into and report the exact condition in which the place was, in order to ascertain whether the defendant was liable for damage on account of the bad condition of the place, as plaintiffs asserted. The defendant did not answer.

Review of the pleadings:

The pleadings set forth in detail the grounds of the respective parties to the suit.

The defense is that it had bound itself as lessee to return the plantation in the same condition in which it had been received, ordinary wear and tear and unavoidable accidents excepted; that the taking of an inventory has no application to drains, fences, bridges, or drainage machinery; that the onus of proving the difference in value between the date of the lease and at the end of the lease was on plaintiffs; that the amount expended in improvements, which the plaintiffs chose to make after they returned into possession of the plantation in the year 1906, was not a fair criterion whereby to judge whether the defendant had complied with its obligations; that these improvements had naught to do with the difference in value between the date the defendant took charge as lessee in 1902 and the date the plaintiffs returned into possession in 1906.

There were a number of grounds of attack and defense; also quite a number of pages of testimony taken. We will refer to these when necessary in deciding the issues.

For the time being we take up for decision the question on the statement above made. The different claims of plaintiffs are 12 in number.

(1) Shortage in seed cane.

(2) Value of peas not planted by defendant.

(3) Rental values of land, due because of defendant's failure to plant peas.

(4) Damage to fences.

(5) Failure to keep up drainage.

(6) Damage to drainage machinery.

(7) Damage to railroad cars.

(8) Damage to bridges.

(9) Damage to cabins.

(10) Damage to scales.

(11) House destroyed by fire.

(12) Cordwood, tires, and trees used by defendants.

We are decidedly of the opinion that, if there were 12 different suits, it would be less difficult to present them to be decided, and for the court to decide them; but the case being between the same parties, its huge proportion on account of the number of witnesses and the extent of the examination is properly before us.

Taking up the first item: Plaintiffs' contention is that they have a right to the value of 82 acres of cane planted in the fall of 1902, and 109 acres in windrow, enough, plaintiffs alleged, to plant 272½ acres.

There is no special dispute about the quantity delivered. The dispute at this point is the number of acres of seed cane planted.

The contention on the part of the defendant is that the 109 acres in windrow was not

sufficient to plant over 101 acres, and that of the 109 acres only 60 acres were ever fit for cultivation.

There was evidence introduced in support of the averment.

It is in place to state that in the year 1902 plaintiffs bought the plantation, and that in accordance with the conditions of the deed the vendor was to take off the crop for his own account and deliver the plantation to the vendees after the grinding season. There was an understanding that the vendor was to leave on the place a sufficient number of acres of seed cane to plant the number of acres agreed upon between the parties, vendor and vendees.

The vendees did not go into possession with the view of cultivating the place themselves in the year succeeding. They entered into a contract of lease just about the time of the purchase, and the place passed from the vendor to defendant as lessee.

Five years from the date of the lease, the vendor to plaintiffs, Mr. Emile Legendre was called upon to testify. Both he and his manager, Mr. Armand, testified that the cane put in windrow by them was good, sound seed cane, which had been properly planted, and that the work of windrowing the seed had been properly done.

Witnesses for the defendant testified to the contrary. One of the managers of defendant in the year 1903, Mr. Hanson, under whose supervision the seed cane was planted, testified positively that the seed cane did not plant over 100 acres. In this he is corroborated by other witnesses. Besides this, his statement was that he was informed by the manager of the vendor of the place in 1902 that the vendor had erred in the number of acres which had been planted while he was manager.

The vendor's manager, Mr. Armand, testified in regard to this statement, and while he did not entirely agree with it he expressed friendly feeling toward this witness, and said

that he was very much given to what is known as heavy planting; that is, that he generally planted a large number of stalks of cane in the furrow prepared for the seed, and he thought that on that account he would meet with disappointment.

We are of opinion that the statement of each was sincerely made, and that the number was as stated by the first manager mentioned above. He knew that a sufficient quantity had been windrowed to plant the number of acres of land stated; but, as he left at the end of the year, he knew nothing of the quality of the cane and the number of acres it would plant, on account of its bad quality.

It is common knowledge that seed cane will sometimes very much deteriorate after it has been windrowed, and that those interested sometimes meet with sad disappointment when the time comes to plant the cane, because of its inferior, and sometimes even worthless, condition.

We leave the question, as relates to the quantity and quality of the seed delivered, with the statement that as to quality plaintiffs have not made out a case which can possibly sustain a judgment on this point.

Plaintiffs sought to sustain the complaint that defendant had not properly planted the seed; that they were taken out of the windrow and left exposed to the sun for three or four days.

We will begin by stating in regard to this point that there was a crevasse at a plantation near by. The defendant sent its hands to the scene of the disaster in order to aid in checking the devastation. During that time, an acre and a fraction of an acre of seed cane was left exposed to the sun a number of days before mentioned.

It was said in evidence that, as to this very limited quantity exposed to the sun, it was not enough to decrease to an extent its value.

Taking the evidence as a whole on this point, we will not charge the defendant with the small quantity of seed that remained thus exposed, especially in the face of the testimony that it was not damaged to any appreciable extent.

Another complaint of the plaintiffs is that the cane was planted too late in the season.

This complaint is answered by the testimony of one of the plaintiffs, who testified that cane may be planted until late in April —a time subsequent to that in which the defendant planted the seed in question.

But plaintiffs say that defendant remained silent, and gave them no notice of any deficiency in the number of acres or as relates to deterioration of the cane.

Although defendant failed to complain to plaintiffs, yet the matter of silence is not ground to deny to the former the right to maintain its position here taken, to wit, that plaintiffs have no ground of complaint, for it returned as good seed as that which was received from them.

It must be borne in mind that the defense is only answering plaintiffs' attack for damages, and is not claiming any damages from plaintiffs on account of deficiency in the seed cane.

We must decline to give to silence a significance the facts and circumstances do not warrant. Comparing the testimony regarding the seed cane as closely as we could, we have not found the difference claimed.

The contract of lease is short. It contains the general outlines of the agreement. Something evidently was left to good will and friendly relations. These continued to be felt to near the end of the term of the lease, and until then no objections were urged—not the least suggestion regarding broken conditions.

A short time before the end of the lease, the plaintiffs and defendant verbally agreed to appoint experts to determine whether or not the place was in about the condition it was when the lessee went into possession.

Plaintiffs did not choose to place reliance on this verbal agreement. A day or two after, they called on officers of the defendant to reduce the agreement to writing. The officers answered, saying that, since their word, verbally given, was not deemed sufficient, they would withdraw entirely from the agreement. They refused to sign.

Since this has been alleged and proven, and is before us, we must state that in our opinion the cause for refusing plaintiffs' request was not sufficient. None the less this does not afford ground to condemn defendant to pay damages, unless the extent of the damages is made clear by the testimony.

Another complaint of plaintiffs is that the land on which the seed cane was windrowed in 1905 was not properly drained.

The contract contains no stipulation in regard to the manner this seed cane was to be laid in windrow. Nothing was said in regard to drainage.

True, that did not relieve the defendant from the necessity of properly doing the work. It, none the less, would have accentuated plaintiffs' right, and would have added certainty to their cause of action.

The deficiency as relates to drainage was not as great as plaintiffs claim, according to the testimony.

The question of drainage of the plantation, and necessarily of the land on which the seed cane was windrowed, will have to be considered later under that head.

The complaint is more particularly directed to seed cane put up by defendant in field cuts 123 and 124: that these cuts were not well drained, and the cane in windrow not properly laid.

Examination of the cane was not thorough. The good cane was not culled out.

It was left in the furrow, and, although not planted, grew up in the furrow in which

it was laid, and some of it made seed, thus indicating that there was good cane left.

We are brought to consider the next item claimed as damages, to wit, the value of the peas.

For this item the sum of $590.62 is claimed, the value of the peas which should have been planted, as plaintiffs urge.

Defendant admits that when it took possession of the place there were 300 acres of land planted in peas, and further admits that it had not planted the peas the last year of its lease. It avers that the weather conditions in 1905 did not permit it to plant. It says that it had the peas on hand; that the continued wet weather and rain, down to and including June, was the preventing cause; that other planters the same year were disappointed in matter of peas.

It seems that in the year 1905 the weather was very unfavorable.

The vendor to plaintiffs, Mr. Emile Legendre, was a successful planter. He was engaged that year in cultivating a plantation near the Ashton. He planted peas. They were destroyed by rain.

"Q. (To this witness). But you saved very few peas? A. Yes, sir; very few peas that year. We lost them by the rain."

Plaintiffs had no right to the value of the peas. That is his claim. Defendant's obligation was to plant the peas, so that the land could be mellow and well prepared. Failure in this, plaintiffs could claim damages. Proof of the value of the peas is not proof of the damages claimed by plaintiffs.

The next ground urged by plaintiffs is that they have a right to compensation for rental of the land rendered useless by the failure to plant peas. For this $2,100 were claimed. We can only say in answer that planting peas is not the only method of planters for cane planting. Other fertilizers are sometimes used.

The plaintiffs used part of the land.

We are of the opinion that plaintiffs have no right to the rental claimed. To arrive at that conclusion, we would have to give more weight to the problematical than we are inclined to do.

Taking the most favorable view, had peas been planted on the whole area of the land in question, and the rain and consequent dampness of the soil had caused the loss of the peas to an extent of less than 20 per cent., none could say with any degree of certainty in that event that the loss was equal to $6 an acre, and that is the demand of plaintiffs.

The land could have been used. We understand that part of it, at least, was used in planting cane, corn, and hay, or, at any rate, that it would have been used.

We have not found more certainty as relates to difference of costs between land first fertilized by planting peas and land fertilized with other fertilizers.

This theory, also, was advanced. It does not illuminate the situation. It is in the end inconclusive, and leads to no satisfactory solution.

Fences around the plantation:

Plaintiffs' contention is that the fences were in good order at the beginning of the lease.

Defendant takes issue with plaintiffs. The defense is that the fence at the end of the lease was about in the same condition as when it went into possession.

As the defendant raised no objection at all to the fence, and no inventory was made, say the plaintiffs, the legal presumption is that the fence was in good order.

Our answer is: Whatever there may be of presumption in this matter, it is not conclusive. While we readily concede that the onus of proof was with defendant, the preponderance of evidence is that the fence was not in the best of condition, although in fairly good condition.

The following is a fair sample of the testimony for defendant:

F. A. Keller, a planter, testified:

"Q. What was the condition of the plantation at the time, say as to the fences on the front road?

"A. Well, fairly good condition; about as they always have been.

"Q. Did you see these fences about January, 1906, three years after?

"A. Yes, sir.

"Q. How did the condition in 1906 compare with the condition in 1902, when Mr. Legendre had the place?

"A. About the same."

This is corroborated by other witnesses of defendant. The testimony, it is true, is contradicted by plaintiffs' witnesses, not, however, to such an extent and in such a way as to overcome the preponderance before stated.

Plaintiffs place reliance upon the expenses which they deemed proper to make on this fence after they had gone into possession. They made repairs at different times during the first two years they went into possession.

How much of these repairs were due by defendant, and how much by plaintiffs, does not appear.

We are not of opinion that the claim for fences is made out.

The manager, Harold, under whose direction these repairs were made, knew nothing of the condition of the fence at the date of the lease. He had a number of new posts put in. Wire fences were substituted to the old fences. In testifying in regard to this fence, he sought to distinguish between repairs and improvements, and left the question in doubt as to whether they were repairs due by defendant.

The defendant cannot be held for all the repairs made on the fence to restore it to a thoroughly good fence; for beyond all question it was not a thoroughly good fence at the end of 1902, when it took charge as lessee.

Drainage:

Plaintiffs claim that the drainage was in good order and condition when the plantation

was delivered to defendant, and in very bad condition at the end of the lease.

Of course, defendant challenges the correctness of these propositions. It claims that the condition was quite as good as when it went into possession. The condition of the drain was not of the best at the beginning of the lease.

One of the witnesses for the plaintiffs, the owner of a plantation at a short distance from plaintiffs' plantation, early in 1906, when plaintiffs had gone into possession, said that it would cost $10,000 to properly drain the place.

It cannot be that defendant can be held liable for any such amount. We infer that the rental was fair enough. It does not appear that it was ever the intention that it should pay, in addition, such a large amount for drainage.

In portraying the condition of the drainage, witnesses for plaintiffs testified that small trees had grown up in the canals and ditches, ranging in diameter from one inch to six inches.

The lease itself was an original lease in 1902. The plantation was cultivated in 1904 and 1905 under a renewal of the lease. The damages to drainage of a date prior to 1904 cannot be claimed. The renewal of the lease operates as a bar to such a claim.

Some of the witnesses for plaintiffs will have it that in the short period of the lease the small trees grew from one inch to six inches. If that be the case, the land must be quite fertile.

It will not be insisted with any degree of reason that there was such a growth in the trees in question in two years.

We are not inclined to criticise the witnesses. We have no doubt of their sincerity. None the less, when we come to fix the amount of damages, we find it impossible with any degree of certainty and satisfaction to do so.

The drainage machine:

$848.75 is claimed for damage to this machine.

This machine, it seems, has caused annoyance and expense to both plaintiffs and defendant.

"But it answered the purpose," said Mr. Legendre, the vendor to plaintiffs. "When I left it was doing its work."

The testimony is that defendant had it repaired several times, and that it did some service, but never satisfactorily. The smokestack rusted and fell of its own weight.

Plaintiffs claim that it should have been painted every year to save it from ruin.

This requirement and others which plaintiffs now insist upon were not specified in the contract of lease.

Without direct evidence showing to what extent that machine was good in 1902, and to what extent it went in the direction of ruin during the years of the lease, we will not undertake to fix the difference between the two and fix damages upon that basis.

Plantation railroad cars:

All the witnesses for defendant who testified about the cars gave an unfavorable account of their condition. They were old, broken cars, and "had arrived at their journey's end," is the testimony.

One of the witnesses, P. A. Keller, said:

"I have occasion to recollect it all my life, because I had them in use, and I'll never forget on account of the bad condition. I had to get them out of the ditches, and I had to do the loading myself, not only that year (1902), but the year previous, and that is the reason I recollect so well about the cars being bad. I had to repair them myself."

Another witness, Paul Frederick, testified that they were always in bad condition since the year 1898.

One of defendant's witnesses stated that by repairing them they were in fairly good condition in 1904.

They were returned the next year to the owners. Fifteen or 20 of these cars were never returned. They had gone to ruin; "out of commission as to some of them," said one of plaintiffs' witnesses.

Robert Hanson, another witness, testified that they were in better condition at the end of the grinding season in 1905 than they were in 1902, when the place was sold to plaintiffs.

Bridges:

The contention is that the bridges were all good when the plantation went into the hands of the lessee.

This was met by defendant with the same defense as heretofore made.

These bridges encountered the rough usage, doubtless, to which plantation bridges are subjected. They frequently have to bear heavy burdens. They become dilapidated and worn.

In 1906, after plaintiffs had taken possession, they repaired some of these bridges; made others entirely new.

Repairs and improvements, with the testimony before us, cannot be charged to the lessee under the present contract of lease.

The manager, Harold, under whose superintendence these bridges were constructed, testified that he did not know "what bridges were there, nor the condition of the bridges, beforehand."

He also testified that he put down tiles, instead of rebuilding the plank bridges. True, he added, that it does not cost any more.

We can say in answer that such changes cannot be made and the lessee charged with the expense without the least notice.

The cabins:

The amount of $3,343.72 is claimed for repairs to cabins.

Here, again, the testimony fails to prove how much was due for actual repairs and how much for improvements.

Mr. Legendre testified that the cabins were not in first-class condition when he owned the place, but "were broken-down cabins; they leaked more or less."

The witnesses for defendant go much further in testifying about their bad condition in 1902.

They required thorough repairs in 1906, and when they had been thoroughly repaired defendant was not liable therefor. They could not be restored, under the facts, to a tenantable state at its expense, as they were barely in that condition when received by it.

The house destroyed by fire:

The evidence regarding this claim was excluded by the judge of the district court, on the ground that the facts and particulars of the negligence charged as ground for the claim were not at all alleged.

We have not found error in the ruling. If there was negligence, it should have been set forth to place the defendant upon its defense.

Platform and scales:

Plaintiffs claim that their large platform and scales, worth $150, were not returned to them.

The following testimony of Henderson Barkeley, defendant's president, is not contradicted:

One wagon scale broke, owing to wear and tear. The other was never used; never weighed any cane on it at all.

This is the scale for the repair of which plaintiffs claim damages in the sum of $105.

It appears that this scale was removed from the place where it was originally because it was not strong enough to hold defendant's railroad.

The defendant owed it to plaintiffs not to remove the scale without giving notice. But at most the defendant would owe the costs of returning it to the place from which it was moved and of repairing it so as to restore it to the condition in which it was.

Nothing is said about returning it to the place at which it was, and as to the repairs for which defendant should be charged the testimony does not warrant fixing any amount. We left the matter where we found it.

The next and last claim is for trees and wood. This involves a small amount. There is no ground to change it by adding a few dollars more to it.

Plaintiffs' insistence is that defendant should have had an inventory made, citing article 2720 of the Revised Civil Code, which provides:

"If no inventory is made the lessee is presumed to have received the thing in good order, and should return it in like good order."

We add here, save contrary proof, and there is contrary proof.

The testimony does not create the impression that the plantation was run down and dilapidated. There was a fair return each year, and the place maintained its value throughout, before it was sold to plaintiffs, while it was cultivated by defendant, and subsequently.

We are well aware that tenants seldom comply with the full measure of their obligation. A lessee is not an owner, and does not feel an owner's interest.

For that reason, after having passed upon each item carefully, we do not find it possible to arrive at a different conclusion.

We are constrained, with the facts before us, to affirm the judgment.

It is affirmed.